PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

THE COUNTRY VINTNER OF NORTH
CAROLINA, LLC,

    *Plaintiff-Appellee,*

v.

E. & J. GALLO WINERY, INC.,

    *Defendant-Appellant.*

No. 12-2074

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
W. Earl Britt, Senior District Judge.
(5:09-cv-00326-BR)

Argued: March 19, 2013

Decided: April 29, 2013

Before SHEDD, DAVIS, and KEENAN, Circuit Judges.

Affirmed by published opinion. Judge Davis wrote the opinion, in which Judge Shedd and Judge Keenan joined.

## COUNSEL

**ARGUED:** Garrick Alcarez Sevilla, Jonathan Ryan Bumgarner, WILLIAMS MULLEN, Raleigh, North Carolina, for Appellant. Stephen Donegan Busch, MCGUIREWOODS, LLP, Richmond, Virginia, for Appellee. **ON BRIEF:** M.

Keith Kapp, Christopher G. Browning, Jr., WILLIAMS MULLEN, Raleigh, North Carolina, for Appellant. Lisa M. Sharp, MCGUIREWOODS, LLP, Richmond, Virginia; Justin D. Howard, MCGUIREWOODS, LLP, Raleigh, North Carolina, for Appellee.

---

**OPINION**

DAVIS, Circuit Judge:

In this case we clarify what expenses related to electronically stored information ("ESI") are taxable under the federal taxation-of-costs statute as "[f]ees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case." 28 U.S.C. § 1920(4). The district court entered an order taxing only the costs of converting electronic files to non-editable formats, and transferring files onto CDs. *Country Vintner of N.C., LLC v. E. & J. Gallo Winery, Inc.*, No. 5:09-cv-326-BR, 2012 WL 3202677, at *3 (E.D.N.C. Aug. 3, 2012). Asserting the district court erred or otherwise abused its discretion, Appellant E. & J. Gallo Winery, the prevailing party in this case, noted its timely appeal from the district court's order. For the following reasons, we affirm.

I.

In January 2005, the winery Bodegas Esmeralda selected Appellee The Country Vintner of North Carolina, LLC ("Country Vintner"), as the exclusive North Carolina wholesaler of Alamos, an Argentinian wine. In January 2009, E. & J. Gallo Winery ("Gallo") began supplying the wine to a network of wholesalers in the state, excluding Country Vintner. Country Vintner sued Gallo, alleging violations of the North Carolina Wine Distribution Agreements Act (the "Wine Act") and the North Carolina Unfair and Deceptive Trade Practices Act.

Almost immediately, the parties clashed over the discovery of ESI. Among other things, Country Vintner sought emails and other writings that "refer[red] to or relate[d] to the establishment of the business relationship between Gallo and Bodegas Esmeralda," Gallo's relationship with wine distributors, and Gallo's "appointment . . . . to import Alamos." J.A. 65–66, 69. During a phone conference to draft a discovery plan, Gallo complained that "retrieval of all potentially relevant electronically stored information . . . [was] not reasonably accessible because of the undue burden and expense it would impose." *Id.* at 58, 673–74. Gallo asserted that it "would have to interview each of . . . more than forty . . . employees," search "at least seven or eight servers in various locations," and "review every single document wherein it communicated with anyone . . . concerning the Alamos brand." *Id.* at 586–87. Country Vintner "agreed to consider any proposal [to] . . . narrow[ ] the field of potential employees . . . and . . . develop key words, search terms, and/or date restrictions in order to search specific repositories of electronically stored information," but otherwise refused to limit its discovery requests. *Id.* at 674–75.

Gallo moved for a protective order, arguing that Country Vintner's discovery requests were "overbroad, vague," "ambiguous," and "not reasonably calculated to lead to the discovery of admissible evidence." J.A. 746–47. Gallo asserted that it would cost $30,000 to process the email data of 24 employees, and up to $432,000 to review the data "to guard against privilege waiver." *Id.* at 748. Gallo further asserted that Country Vintner "ha[d] refused to offer any meaningful assistance" in "narrowing the field of potential employees" or "assisting Gallo to develop key words, search terms, and/or date restrictions." *Id.* at 748–49.

Country Vintner opposed the motion and moved to compel Gallo to provide more complete responses to its interrogatories and requests for documents and admission. J.A. 832–43. Country Vintner accused Gallo of a "strategic decision to

avoid responding to discovery," and asserted that Country Vintner "ha[d] suffered prejudice because it continue[d] to lack information . . . to adequately prosecute its case . . . ." *Id.* at 842.

The district court denied Gallo's motion for a protective order and adopted Country Vintner's proposal for handling ESI: the court ordered Gallo to "run searches on archived e-mail and documents created [in a one-year period] by an initial set of eight identified custodians," using 16 search terms proposed by Country Vintner and "any other terms suggested by [Gallo] [that] might produce relevant documents." J.A. 887–88. The court further ordered that, after Gallo "determine[d] the volume of materials produced by these searches," the parties "meet and confer to agree upon a sequence for disclosure of the electronically stored information on a rolling production." *Id.* at 887. The court also granted Country Vintner's motion to compel, "to the extent that [Gallo] ha[d] additional relevant and responsive information that it ha[d] not yet provided to [Country Vintner]." *Id.* at 894.

In response to the court's order, Gallo "collected more than 62 GB of data" and forwarded it to its lawyers' firm for "processing and review." J.A. 930. The firm "process[ed] the data into a searchable format, remove[d] system files and exact duplicates, and then [ran] three variations of the phrases and search terms set forth in the [district court's] order." *Id.* Country Vintner proposed applying 19 search terms to the 62 GB of data, and noted a preference for "receiving [the] ESI in a format compatible with Summation." *Id.* at 961–62.[1] Gallo had used different litigation support software, IPRO eCapture and kCura Relativity, to process the data. *Id.* at 930.

---

[1]Summation is a "review platform," i.e., software "used to store, display, sort, search, tag, code, annotate, redact and/or produce ESI." Craig D. Ball, American Law Institute–American Bar Association Course of Study, *E-Discovery: Right . . . From the Start*, at 275 n.3 (July 23-25, 2009).

Less than two months after Gallo began producing documents, the district court granted Gallo's motion to dismiss Country Vintner's claim under the North Carolina Unfair and Deceptive Trade Practices Act. The parties then filed cross-motions for summary judgment on the remaining Wine Act claims, and the court granted summary judgment in favor of Gallo. Upon Country Vinter's appeal of the order granting summary judgment in favor of Gallo, we affirmed. *Country Vintner of N.C., LLC v. E & J Gallo Winery, Inc.*, 461 F. App'x 302, 308 (4th Cir. 2012).

Gallo thereafter filed in the district court a bill of costs, seeking to recover $111,047.75 from Country Vintner for charges related to ESI. Gallo sought costs in the following six categories:

*First*, $71,910 for "flattening" and "indexing" ESI. J.A. 1229–30. This "initial processing" of data involved decompressing container files[2] (e.g., ZIP files or Microsoft PST files); making the data searchable by extracting text and creating Optical Character Recognition[3] for text that could not be extracted; indexing the data; removing system files that were known not to contain any user-generated content; and removing duplicate files. *Id.* 1224.

*Second*, $15,660 for "Searching/Review Set/Data Extraction." J.A. 1229–30. This process involved extracting metadata[4]

---

[2]A container file is "[a] single file containing multiple documents and/or files." Sedona Conference, *The Sedona Conference Glossary: E-Discovery & Digital Information Management* 10 (3d ed. Sept. 2010) [hereinafter "Sedona Glossary"].

[3]Optical Character Recognition ("OCR") is "[a] technology process that translates and converts printed matter on an image into a format that a computer can manipulate . . . and, therefore, renders that matter text searchable." Sedona Glossary 37.

[4]Metadata is simply "data that provides information about other data." Merriam-Webster Dictionary, available at http://www.merriam-webster.com/dictionary/metadata (last visited April 9, 2013).

from the documents; "unitiz[ing]" electronic documents by "locat[ing] logical document breaks for purposes of reviewing, searching, and production"; creating an index of metadata for every electronic document; and exporting and loading the electronic documents and metadata onto a "review/production platform." *Id.* at 1225.

*Third*, $178.59 for "TIFF Production" and "PDF Production." J.A. 1229–31. This process involved converting original or "native" documents to a .tif[5] or .pdf format[6] to render them non-editable. *Id.* at 1225.

*Fourth*, $74.16 for electronic "Bates Numbering." J.A. 1230. In this "higher-tech version" of Bates stamping, the TIFF or PDF documents were "endorsed . . . with a unique

"Metadata may be totally innocuous, such as formatting instructions and margin determinations, but sometimes metadata provides crucial evidence that is not available in a paper document." "Metadata may reveal who worked on a document, the name of the organization that created or worked on it, information about prior versions of the document, recent revisions, and comments inserted in the document during drafting or editing . . . . The hidden text may reflect editorial comments, strategy considerations, legal issues raised by the client or the lawyer, or legal advice provided by the lawyer." Metadata may provide information that a paper document would not provide or information that differs from a paper document. Metadata may also reveal that a document has been changed or backdated.

Jennifer M. Smith, *Electronic Discovery and the Constitution: Inaccessible Justice*, 6 J. Legal Tech. Risk Mgmt. 122, 138-39 (2012) (ellipsis in original) (footnotes omitted).

[5] The .tif extension connotes a TIFF file, "[a] widely used and supported graphic file format[ ] for storing . . . images." Sedona Glossary 50. TIFF stands for Tagged Image File Format. *Id.*

[6] PDF, short for Portable Document Format, is "[a] file format technology developed by Adobe Systems to facilitate the exchange of documents between platforms regardless of originating application by preserving the format and content." Sedona Glossary 39.

number that allow[ed] all parties to track the document[s]." *Id.* at 1226.

*Fifth*, $40 for copying images onto a CD or DVD. J.A. 1226, 1230.

*Sixth*, $23,185 for "management of the processing of the electronic data," "quality assurance procedures," "analyzing corrupt documents and other errors," and "preparing the production of documents to opposing counsel." J.A. 1227, 1232–37.

The parties having vigorously contested the propriety of the bill of costs filed with the clerk, and having filed numerous legal memoranda, the clerk of the district court deferred the matter of costs to the presiding district judge.

The district court granted in part and denied in part the bill of costs. Adopting the reasoning of the Third Circuit, the court concluded that, under 28 U.S.C. § 1920(4), "a prevailing party may recover costs associated with copying or duplicating its files, but it may not receive reimbursement for any other ESI-related expenses." *Country Vintner of N.C., LLC*, 2012 WL 3202677, at *2 (citing *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 674 F.3d 158 (3d Cir. 2012)). The court found that, in this case, "the only tasks that involve[d] copying [we]re the conversion of native files to TIFF and PDF formats and the transfer of files onto CDs." *Id.* at *3. The court concluded that Gallo was entitled to recover $218.59 in ESI-related costs:

| | | |
|---|---|---|
| 1. 19 March 2010, TIFF production: | $ | 8.46 |
| 2. 19 March 2010, CD Copy: | $ | 10.00 |
| 3. 2 April 2010, TIFF Production: | $ | 4.20 |
| 4. 16 April 2010, PDF Production: | $ | 6.84 |

| | | |
|---|---|---|
| 5. 19 April 2010, CD Copy: | | $ 10.00 |
| 6. 19 April 2010, TIFF Production: | | $ 21.96 |
| 7. 22 June 2010, CD Copy: | | $ 10.00 |
| 8. 23 June 2010, TIFF Production: | | $134.10 |
| 9. 25 June 2010, TIFF Production: | | $   3.00 |
| 10. 1 July 2010, CD Copy: | | $ 10.00 |
| 11. 1 July 2010, TIFF Production: | | $    .03 |

TOTAL: $218.59

*Id*.

The court noted that "it [was] possible that the bill of costs . . . contain[ed] other ESI-related expenses that [were] taxable," but concluded that such costs were not "readily discern[able]" because "Gallo ha[d] included various multi-task entries." *Country Vintner of N.C., LLC*, 2012 WL 3202677, at *3 n.5. The district court also concluded that none of the "the ESI-related costs in this case . . . qualif[ied] as fees for exemplification under any established construction of the term." *Id.* *2 n.4. Approving $350 for "[f]ees of the clerk," the court awarded total costs of $568.59. *Id.* at *3.

We exercise jurisdiction pursuant to 28 U.S.C. § 1291.

II.

On appeal, Gallo argues that 28 U.S.C. § 1920(4) allows recovery of its ESI processing charges and the district court erred in excluding them from the award of costs. Country Vintner counters that the district court properly denied these

charges as outside the scope of § 1920(4). For the following reasons, we affirm the district court's order.

### A.

"Under Rule 54(d)(1) of the Federal Rules of Civil Procedure, costs 'should be allowed to the prevailing party' unless a federal statute provides otherwise." *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 636 (4th Cir. 2010) (quoting Fed. R. Civ. P. 54(d)(1)). "Section 1920 enumerates expenses that a federal court may tax as a cost under the discretionary authority found in Rule 54(d)." *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441–42 (1987).

"Generally, we review the district court's award of . . . costs for abuse of discretion." *Bosley v. Mineral Cnty. Comm'n*, 650 F.3d 408, 411 (4th Cir. 2011). "However, where a district court's decision is based on a premise and interpretation of the applicable rule of law, and the facts are established, we review that decision de novo." *Id.* (internal quotation marks omitted).

Because the parties dispute whether the district court properly interpreted § 1920(4), we apply de novo review. *See Bosley*, 650 F.3d at 411. *See also Synopsys, Inc. v. Ricoh Co. (In re Ricoh Co. Patent Litig.)*, 661 F.3d 1361, 1364 (Fed. Cir. 2011) ("[W]hether a particular expense falls within the purview of section 1920, and thus may be taxed in the first place, is an issue of statutory construction, subject to de novo review.").

### B.

The taxation-of-costs statute, 28 U.S.C. § 1920, sets forth "[t]he costs that may be awarded to prevailing parties in lawsuits brought in federal court." *Taniguchi v. Kan P. Saipan, Ltd.*, 132 S. Ct. 1997, 1999–2000 (2012). In deciding whether subsection (4) permits the taxation of ESI processing charges,

we follow the Supreme Court's example and begin with a brief overview of the statute. *See id.* at 2001–02.

"At common law, costs were not allowed," *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975), but "federal courts in the early years . . . award[ed] costs in the same manner as the courts of the relevant forum State," *Taniguchi*, 132 S. Ct. at 2001. This resulted in "great diversity in practice among the courts," with "losing litigants" often "unfairly saddled with exorbitant fees for the victor's attorneys." *Alyeska Pipeline Serv. Co.*, 421 U.S. at 251.

In 1853, Congress enacted a predecessor to § 1920 "to standardize the costs allowable in federal litigation," *Alyeska Pipeline Serv. Co.*, 421 U.S. at 251, and "simplify the taxation of fees, by prescribing a limited number of definite items to be allowed," Cong. Globe, 32nd Cong., 2d Sess. App. 207 (1853) (statement of Sen. Bradbury). *See also id.* (noting the lack of a "uniform rule . . . for the regulation of . . . costs," and the bill's purpose to "prescribe the costs which shall be taxed and recovered"). "The result was a far-reaching Act specifying in detail the nature and amount of the taxable items of cost in the federal courts." *Alyeska Pipeline Serv. Co.*, 421 U.S. at 251–52. The 1853 act provided that

> [t]he bill of fees of clerk, marshal, and attorneys, and the amount paid printers, and witnesses, and *lawful fees for exemplifications and copies of papers necessarily obtained for use on trial* in cases where by law costs are recoverable in favor of the prevailing party, shall be taxed by a judge or clerk of the court, and be included in and form a portion of a judgment or decree against the losing party.

Act of Feb. 26, 1853, 10 Stat. 161, 168 (emphasis added). The statute's "comprehensive scope" and "the particularity with which it was drafted demonstrated . . . that Congress meant

to impose rigid controls on cost-shifting in federal courts." *Crawford Fitting Co.*, 482 U.S. at 444.

"The 1853 Act was carried forward in the Revised Statutes of 1874 and by the Judicial Code of 1911." *Alyeska Pipeline Serv. Co.*, 421 U.S. at 255. "Its substance, without any apparent intent to change the controlling rules, was also included in the Revised Code of 1948 as 28 U.S.C. §§ 1920 and 1923(a)." *Id.* at 255 (footnotes omitted).

The 1948 version of § 1920 provided that

> [a] judge or clerk of any court of the United States may tax as costs the following:
>
> (1)  Fees of the clerk and marshal;
>
> (2)  Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
>
> (3)  Fees and disbursements for printing and witnesses;
>
> (4)  *Fees for exemplification and copies of papers necessarily obtained for use in the case*;
>
> (5)  Docket fees under section 1923 of this title.

62 Stat. 955 (1948) (emphasis added). In 1978, Congress amended the statute to add a sixth category of taxable costs:

> (6)  Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs

> of special interpretation services under
> section 1828 of [title 28].

Pub. L. No. 95-539, 92 Stat. 2040, 2044 (1978).

The statute remained unchanged until 2008, when Congress updated subsections (2) and (4) to allow the taxation of:

(1) [f]ees *for printed or electronically recorded transcripts* necessarily obtained for use in the case; [and]

\* \* \*

(2) [f]ees for exemplification and *the costs of making copies of any materials where the copies are* necessarily obtained for use in the case[.]

Judicial Administration and Technical Amendments Act of 2008, Pub. L. No. 110–406, 122 Stat. 4291, 4292 (2008) (codified at 28 U.S.C. § 1920(2) & (4)) (emphasis added).

These amendments originated with the Judicial Conference of the United States (the "Judicial Conference") and its Committee on Court Administration and Case Management (the "Committee"). Judicial Conference, *Report of the Proceedings of the Judicial Conference of the United States* 9–10 (March 18, 2003) [hereinafter "Judicial Conference Report"]; 28 U.S.C. § 1920(2) & (4). Sometime before December 2002, a former magistrate judge had asked the Committee to consider "proposing amendments to 28 U.S.C. § 1920 that would allow expenses associated with new courtroom technologies to be included in the taxing of litigation costs." Committee on Court Administration and Case Management, *Report of the Judicial Conference, Committee on Court Administration* 3 (March 2003) [hereinafter "Committee Report"].

In December 2002,

the Committee considered whether technological advances that ha[d] occurred over the past twenty-five years ma[d]e it appropriate to reevaluate the cost provisions in 28 U.S.C. § 1920, so that recovery for costs associated with many litigation tools commonly used [in 2002], including videotaped depositions or electronically presented evidence, might be permitted.

Committee Report 3–4. While the Committee "agreed that § 1920 [did] not address many of the technology expenses that [we]re . . . often expended in federal litigation," it "was concerned . . . that the charges for these new expenses could dramatically expand the intention of the statute, which was to allow the taxing of costs in a very limited way." *Id.* at 4.

Therefore, the Committee decided to recommend that the Judicial Conference endorse two limited statutory amendments to 28 U.S.C. § 1920. The first would amend subsection (2) to recognize the availability of transcripts in electronic form. The second would expand the concept of "papers" in subsection (4) in order to reflect the decreasing use of paper and the increasing use of technology in creating, filing, and exchanging court documents. The Committee rejected the concept of an amendment to permit the taxing of costs associated with the use of technology to create, assist, enhance or present materials during a trial.

*Id.* In March 2003, the Judicial Conference adopted the Committee's recommendation. Judicial Conference Report 10.

Congress enacted the proposed amendments verbatim, as part of the Judicial Administration and Technical Amendments Act of 2008. Judicial Conference Report 10; 28 U.S.C. § 1920(2) & (4). Senator Leahy, a co-sponsor of the bill, explained that the legislation aimed to "facilitate and update

judicial operations," "improve judicial resource management and strengthen the constitutional protection of Americans' right to serve on juries," and "clarify existing [criminal] law to better fulfill Congress's original intent." 154 Cong. Rec. S9898 (Sept. 27, 2008) (statement of Sen. Leahy). In the House, Rep. Lofgren described the bill as a collection of "noncontroversial measures proposed by the Judicial Conference to improve efficiency in the Federal courts." 152 Cong. Rec. H10271 (Sept. 27, 2008) (statement of Rep. Lofgren).[7] She also noted that the legislation would "mak[e] electronically produced information coverable in court costs." *Id.*

## III.

On appeal, Gallo seeks the $111,047.75 in ESI-related charges it initially sought, less (1) $218.59 the district court awarded, (2) $74.16 in charges for Bates numbering, and (3) $8,897 in "charges for any billable time" related to "Bates numbering, searching, or production-related activities." Opening Br. 22 & n.7. Gallo argues that the remaining $101,858 in "ESI processing charges" is taxable under 28 U.S.C. § 1920(4) as both "costs of making copies of any materials where the copies are necessarily obtained for use in the case," and "[f]ees for exemplification . . . of any materials." *Id.* at 18, 20. We are not persuaded by Gallo's arguments, but neither do we embrace wholesale Country Vintner's crabbed interpretation of the amended costs statute.

## A.

As a preliminary matter, we reject Country Vintner's contention that § 1920(4) applies only to the costs related to

---

[7]*See also* 152 Cong. Rec. H10272 (Sept. 27, 2008) ("[T]he purpose of [the bill] is to implement noncontroversial administrative provisions that the Judicial Conference and the House Judiciary Committee believe are necessary to improve the operations of the Federal judiciary.") (statement of Rep. Smith).

materials attached to dispositive motions or produced at trial. To the extent that Country Vintner has not waived this challenge,[8] the argument fails on the merits. Although the original costs statute limited taxation to "lawful fees for exemplifications and copies of papers necessarily obtained for use *on* trial," 10 Stat. 161, 168 (emphasis added), the current statute more broadly permits taxation of "[f]ees for exemplification and the costs of making copies . . . necessarily obtained for use *in the case*," 28 U.S.C. § 1920(4) (emphasis added). Moreover, several circuits have found that § 1920(4) encompasses discovery-related costs.[9] Thus, the plain language and

---

[8]"The general rule is that without taking a cross-appeal, the prevailing party may present any argument that supports the judgment in its favor as long as the acceptance of the argument would not lead to a reversal or modification of the judgment . . . . " *JH ex rel. JD v. Henrico Cnty. Sch. Bd.*, 326 F.3d 560, 567 n.5 (4th Cir. 2003) (internal quotation marks and alteration omitted); c*f. Genesis Healthcare Corp. v. Symczyk*, ___ S.Ct. ___, No. 11–1059, 2013 WL 1567370, at *5 (U.S. Apr. 16, 2013) (noting analogous rule regarding cross-petitions for *certiorari* in the Supreme Court). Country Vintner argues that discovery-related costs are not taxable under § 1920, but the district court awarded $218.59 for Gallo's discovery-related costs of converting files to non-editable formats, and burning documents onto CDs. Thus, "acceptance of [Country Vintner's] argument would . . . lead to a . . . modification of the judgment"—i.e., a reduction of $218.59 in the costs awarded by the district court. *JH ex rel. JD*, 326 F.3d at 567 n.5.

[9]*See In re Ricoh Co., Ltd. Patent Litig.*, 661 F.3d at 1365 (applying Ninth Circuit law) ("Under section 1920(4), exemplification and copying costs for producing documents in discovery are recoverable."); *Rundus v. City of Dallas, Tex.*, 634 F.3d 309, 316 (5th Cir. 2011) ("[C]osts incurred merely for discovery . . . . are recoverable if the party making the copies has a reasonable belief that the documents will be used during trial or for trial preparation.") (internal quotation marks omitted); *U.S. E.E.O.C. v. W & O, Inc.*, 213 F.3d 600, 623 (11th Cir. 2000) ("Copies attributable to discovery are a category of copies recoverable under § 1920(4).") (internal quotation marks omitted); *Illinois v. Sangamo Constr. Co.*, 657 F.2d 855, 867 (7th Cir. 1981) (affirming taxation of costs of copying, *inter alia*, discovery documents because the "expense of copying materials reasonably necessary for use in the case are recoverable costs under 28 U.S.C. § 1920(4)," and "[t]he underlying documents need not be introduced at

weight of authority establish that the costs of exemplifications and copies in discovery are taxable under § 1920(4).

B.

Turning to the merits of Gallo's appeal, we must first determine whether Gallo's ESI processing charges constitute "costs of making copies . . . necessarily obtained for use in the case." 28 U.S.C. § 1920(4). We think not.

1.

"As with any issue of statutory interpretation, we focus on the plain language of the statute, seeking first and foremost to implement congressional intent." *WEC Carolina Energy Solutions LLC v. Miller*, 687 F.3d 199, 203 (4th Cir. 2012) (internal quotation marks and ellipsis omitted). "To determine a statute's plain meaning, we not only look to the language itself, but also the specific context in which that language is used, and the broader context of the statute as a whole." *In re Total Realty Mgmt., LLC*, 706 F.3d 245, 251 (4th Cir. 2013) (internal quotation marks omitted).

Here, the relevant statutory language is "making copies." 28 U.S.C. § 1920(4). Because the term is not defined in the statute, we must apply "its ordinary meaning." *Taniguchi*, 132 S. Ct. at 2002.

"Copies" has appeared in the taxation statute since its

---

trial in order for the cost of copying them to be recoverable"). That some courts deny discovery costs as a matter of discretion does not mean that such costs are not recoverable under § 1920(4) as a matter of law. *See Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 601–02 (8th Cir. 2009) (affirming district court's refusal to tax certain discovery costs as a matter of discretion, without reaching the question of whether such costs are taxable as a matter of law).

enactment in 1853, when "copy" meant a "transcript,"[10] a "writing like another writing,"[11] or an "imitation."[12] Today, "copy" still refers to "an imitation, transcript, or reproduction of an original work."[13] To "make" means "to cause to happen,"[14] "to bring into being by forming, shaping, or altering material,"[15] to "produce (a material thing)"[16] or to "construct" or "assemble."[17] Thus, "making copies" means producing imitations or reproductions of original works.

Although the ordinary meaning of the phrase is expansive, its application is limited by the "broader context of [§ 1920] as a whole." *In re Total Realty Mgmt., LLC*, 706 F.3d at 251. The Supreme Court has observed that taxable costs under the statute are "modest in scope" and "limited to relatively minor, incidental expenses." *Taniguchi*, 132 S. Ct. at 2006:

---

[10]Benjamin Vaughan Abbott, *Dictionary of Terms and Phrases Used in American or English Jurisprudence* 287 (1879); John Walker, *A Critical Pronouncing Dictionary* 84 (1858); Samuel Johnson, *A Dictionary of the English Language* 151 (1853); Noah Webster, *An American Dictionary of the English Language* 192 (1830); George Crabb, *A Dictionary of General Knowledge* 110 (1830).

[11]Noah Webster, *An American Dictionary of the English Language* 192 (1830).

[12]Noah Webster, *A Dictionary of the English Language, Abridged from the American Dictionary* 91 (1850).

[13]Merriam-Webster Dictionary online, http://www.merriam-webster.com/dictionary/copy (last visited April 9, 2013). *See also* Oxford English Dictionary online, http://www.oed.com (enter "copy" in the "quick search" box and click on the first result) (defining "copy" as "[a] transcript or reproduction of an original") (last visited April 9, 2013).

[14]Merriam-Webster Dictionary online, http://www.merriam-webster.com/dictionary/make (last visited April 9, 2013).

[15]*Id.*

[16]Oxford English Dictionary online, http://www.oed.com (enter "make" in the "quick search" box and click on the fourth result) (last visited April 9, 2013).

[17]*Id.*

[Section] 1920 . . . lists such items as clerk fees, court reporter fees, expenses for printing and witnesses, expenses for exemplification and copies, docket fees, and compensation of court-appointed experts. Indeed, the assessment of costs most often is merely a clerical matter that can be done by the court clerk. Taxable costs are a fraction of the non-taxable expenses borne by litigants for attorneys, experts, consultants, and investigators. It comes as little surprise, therefore, that costs almost always amount to less than the successful litigant's total expenses in connection with a lawsuit.

*Id.* (internal quotation marks and citations omitted).[18]

Gallo argues that its ESI-processing charges are taxable as fees for "making copies" under § 1920(4) because ESI has "unique features": ESI is "more easily and thoroughly change-able than paper documents," it contains metadata, and it often has searchable text. Opening Br. 23, 26–27. Gallo contends that converting native files to PDF and TIFF formats "produce[d] static, two-dimensional images that, by themselves, [we]re incomplete copies of dynamic, multi-dimensional ESI"; other "processing . . . was necessary to copy *all* integral features of the ESI." *Id.* at 28 (emphasis in original). Gallo argues that it had to remove ESI from container files, extract and index text to make it searchable, copy metadata, and load the data onto a "review platform" to allow "the native files and their associated metadata [to] be viewed and their text [to] be searched as if the native files were being opened in the software applications that created them." *Id.* at 28–29. Gallo concedes that this process was far more involved than that necessary to copy paper documents but argues that

---

[18]In *Taniguchi*, the Court held that "compensation of interpreters"—added by the Court Interpreters Act as a taxable cost under § 1920(6)—"is limited to the cost of oral translation and does not include the cost of document translation." *Taniguchi*, 132 S. Ct. at 2000.

just as copying a table or dress requires a different approach than copying a paper document, copying ESI also requires a different approach.

*Id.* at 26.

Country Vintner counters that Gallo "distorts the plain meaning of the statute" and "misconstrue[s] the act of processing," which was "not required in order to produce *copies* to Country Vintner, only to assist Gallo with its review." Resp. Br. 17, 22 (emphasis in original). Country Vintner disputes that Gallo "had no choice but to process the ESI . . . in order to comply with its discovery obligations," because "Country Vintner never demanded that Gallo produce processed ESI replete with metadata and searchable text." *Id.* at 20. Country Vintner thus asks us to affirm the district court's adoption of the Third Circuit's approach in *Race Tires America, Inc. v. Hoosier Racing Tire Corp.*

In *Race Tires America, Inc.*, the Third Circuit held that, "of the numerous services [that] [electronic discovery] vendors [had] performed" in that case, "only the scanning of hard copy documents, the conversion of native files to TIFF, and the transfer of VHS tapes to DVD involved 'copying'" within the meaning of § 1920(4). *Race Tires Am. Inc.*, 674 F.3d at 171. The court reasoned that

> [s]ection 1920(4) does not state that all steps that lead up to the production of copies of materials are taxable. It does not authorize taxation merely because today's technology requires technical expertise not ordinarily possessed by the typical legal professional. It does not say that activities that encourage cost savings may be taxed. Section 1920(4) authorizes awarding only the cost of making copies.

*Id.* at 169 (footnote omitted). The court recognized that "extensive 'processing'" may be "essential to make a comprehensive and intelligible production" of ESI. *Id.*

> Hard drives may need to be imaged, the imaged drives may need to be searched to identify relevant files, relevant files may need to be screened for privileged or otherwise protected information, file formats may need to be converted, and ultimately files may need to be transferred to different media for production.

*Id.* Nonetheless, the court reasoned, "that does not mean that the services leading up to the actual production constitute 'making copies.'" *Id.*

> The process employed in the pre-digital era to produce documents in complex litigation similarly involved a number of steps essential to the ultimate act of production. First, the paper files had to be located. The files then had to be collected, or a document reviewer had to travel to where the files were located. The documents, or duplicates of the documents, were then reviewed to determine those that may have been relevant. The files designated as potentially relevant had to be screened for privileged or otherwise protected material. Ultimately, a large volume of documents would have been processed to produce a smaller set of relevant documents. None of the steps that preceded the actual act of making copies in the pre-digital era would have been considered taxable. And that is because Congress did not authorize taxation of charges necessarily incurred to discharge discovery obligations. It allowed only for the taxation of the costs of making copies.

*Id.* The Third Circuit further reasoned that the Supreme Court has "accorded a narrow reading to the cost statute in other

contexts," and "[n]either the degree of expertise necessary to perform the work nor the identity of the party performing the work of 'making copies' is a factor that can be gleaned from § 1920(4)." *Id.* at 169, 171. "Nor may the courts invoke equitable concerns . . . to justify an award of costs for services that Congress has not made taxable." *Id.* at 170.

We find the Third Circuit's reasoning persuasive. The court properly took into account the statute's history, its plain language, and the Supreme Court's narrow contemporary interpretation of the costs taxable under § 1920. All of these considerations support the conclusion that, in this case, subsection (4) limits taxable costs to those identified by the district court: converting electronic files to non-editable formats, and burning the files onto discs.[19]

That Gallo will recover only a fraction of its litigation costs under our approach does not establish that our reading of the statute is too grudging in an age of unforeseen innovations in litigation-support technology.[20] The Supreme Court has emphasized that "costs almost always amount to less than the successful litigant's total expenses," and § 1920 is "limited to

---

[19]We are mindful that converting ESI from editable to non-editable formats, or copying ESI in its native format, often encompasses the copying of metadata. *See supra* n.4. If, for instance, a case directly or indirectly required production of ESI-unique information such as metadata, we assume, without deciding, that taxable costs would include any technical processes necessary to copy ESI in a format that includes such information. This case does not fall within those limited circumstances.

[20]We are not confronted with a case in which the parties clearly agreed to the production of ESI on a particular database or in native file format. Thus, we have no occasion to consider the scope of allowable costs for the production of ESI under such circumstances. *Compare In re Ricoh Co., Ltd. Patent Litig.*, 661 F.3d 1361, 1365-66 (Fed. Cir. 2011) (holding, when parties agreed to produce ESI in native file format on particular database, that "the costs of producing a document electronically can be recoverable," including basic costs of the database), *with Race Tires*, 674 F.3d at 171 n.11 (stating that *In re Ricoh* "is plainly distinguishable" on this basis).

relatively minor, incidental expenses." *Taniguchi*, 132 S. Ct. at 2006. Moreover, "the presumption is that the responding party must bear the expense of complying with discovery requests." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358 (1978). To the extent that such costs are excessive, a party "may invoke the district court's discretion under [Fed. R. Civ. P. 26] to grant orders protecting [it] from undue burden or expense . . . , including orders conditioning discovery on the requesting party's payment of the costs of discovery." *Id.* (internal quotation marks omitted). When, as here, a district court denies a protective order, the movant can appeal that decision; it cannot obtain the same relief from § 1920, which "impose[s] rigid controls on cost-shifting in federal courts." *Crawford Fitting Co.*, 482 U.S. at 444.[21]

For all these reasons, we agree with the district court's finding that, in this case, only the conversion of native files to TIFF and PDF formats, and the transfer of files onto CDs, constituted "making copies" under § 1920(4).[22]

2.

We next determine whether Gallo's ESI processing charges are taxable as "[f]ees for exemplification." 28 U.S.C. § 1920(4). We think not.

Gallo argues that "[e]xtracting text and metadata" constitutes exemplification because they "illustrate by example [the] important features of the native files." Opening Br. 36–37 (internal quotation marks omitted). Gallo further argues that

---

[21]Notably, Gallo does not appeal the district court's denial of a protective order in this case.

[22]Gallo does not challenge—and thus, we need not review—the district court's conclusion that Gallo had included "various multi-task entries in the bill of costs," and thus, had failed to prove entitlement to taxable costs "other than those . . . in [the] order." *Country Vintner of N.C., LLC*, 2012 WL 3202677, at *3 n.5.

"loading . . . ESI into a review platform" constitutes exemplification because it "illustrates by example the important features of the ESI as if someone were seeing the ESI in its native computer environment." *Id.* at 37 (internal quotation marks omitted).

"Exemplification" has appeared in the statute since 1853, when the word meant "an illustration by example"[23] or "[a]n official transcript of a document from public records, made in [a] form to be used as evidence, and authenticated as a true copy."[24] Today, the word means "the act or process" of "show[ing] or illustrat[ing] by example,"[25] or "[a]n official transcript of a public record, authenticated as a true copy for use as evidence."[26]

Other circuits are split over the meaning of "exemplification" as used in § 1920(4). For instance, the Federal Circuit, applying Sixth Circuit law, has found that "exemplification" is constrained to its legal meaning—"an official transcript of a public record, authenticated as a true copy to use as evidence"—because Congress did not adopt "the broad phrase 'demonstrative evidence.'" *Kohus v. Cosco, Inc.*, 282 F.3d 1355, 1358–59 (Fed. Cir. 2002). The Seventh Circuit has taken a more expansive view, interpreting "exemplification" to mean "the act of illustration by example," a definition "broad enough to include a variety of exhibits and demonstrative aids." *Cefalu v. Vill. of Elk Grove*, 211 F.3d 416, 427 (7th Cir. 2000).

---

[23]Noah Webster, *A Dictionary of the English Language, Abridged from the American Dictionary* 142 (1850). *See also* John Walker, *A Critical Pronouncing Dictionary* 132 (1858) (defining "exemplification" as "[a] copy, a transcript, an illustration by example; draught for a record").

[24]Benjamin Vaughan Abbott, *Dictionary of Terms and Phrases Used in American or English Jurisprudence* 463 (1879).

[25]Merriam-Webster Dictionary online, http://www.merriam-webster.com/dictionary/exemplification and http://www.merriam-webster.com/dictionary/exemplify (last visited April 5, 2013).

[26]Black's Law Dictionary (9th ed. 2009).

We need not determine in this case which view is most harmonious with the statute. Gallo's charges include neither authentication of public records nor exhibits or demonstrative aids. Accordingly, the district court correctly concluded that "the . . . costs in this case [do] not qualify as fees for exemplification." *Country Vintner of N.C., LLC*, 2012 WL 3202677, at *2 n.4.

## IV.

In sum, for the reasons set forth, we agree with the district court's finding that only the conversion of native files to TIFF and PDF formats, and the transfer of files onto CDs, constituted "making copies" under § 1920(4), and that none of Gallo's expenses constituted "[f]ees for exemplification."

*AFFIRMED*